

United States District Court
Northern District of Illinois
Eastern Division

JAMES HASTINGS,  )
        Plaintiff  )   No. 04 C 6484
  )
      v.  )
  )
JO ANNE BARNHART,  )   Magistrate Judge Arlander Keys
COMMISSIONER OF SOCIAL  )
SECURITY,  )
        Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff, James C. Hastings, moves this Court for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure to reverse the final decision of the Commissioner of Social Security, denying his claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).  In the alternative, Plaintiff asks this Court to remand the decision for further proceedings.  The Commissioner has filed a cross-motion for summary judgment.  For the reasons set forth below, the Court grants Plaintiff's motion and remands the case to the Commissioner for further proceedings.

### Procedural History

On August 24, 2001, Plaintiff filed an application for DIB and SSI, alleging that he became disabled on December 29, 2000, due to a lower back injury.  (*See* R. at 49-51, 302-04.)  The Social Security Administration (SSA) denied Plaintiff's claims and Request for Reconsideration, determining that Plaintiff still had the ability to do light work.  (30, 34, 37, 40, 306, 310,

312, 315). The SSA concluded that his condition prevented him from doing past jobs but did not preclude him from engaging in other types of less demanding work. (R. at 34, 40, 310, 315.) Plaintiff requested a hearing before an administrative law judge (ALJ). On April 16, 2003, ALJ John L. Mondi presided over Plaintiff's hearing, where Plaintiff, represented by counsel, testified. (R. at 41, 320.) The ALJ issued his decision on June 16, 2003 and denied Plaintiff's claim for benefits. (R. at 15.) He concluded that Plaintiff was not disabled, because he could perform his past relevant work as a driver. (R. at 14-15.) Plaintiff filed a request for review with the Social Security Appeals Council, which was subsequently denied. (R. at 5, 18-20.) Upon denial of his appeal, the Plaintiff filed the present action for judicial review.

## **Factual Background**

### **I. Testimony at the April 16, 2002 Hearing**

Mr. Hastings testified that he was born on March 31, 1959, and was 44 years old at the time of the hearing. (R. at 324.) He was divorced and had three children: one son, age 23, from his first marriage, and two daughters, ages 4 and 11, from a relationship with a girlfriend. (*Id.*)

Mr. Hastings testified that he had completed the eleventh grade and was trying to obtain a GED. (R. at 324, 338-39.) The class met twice a week for two hours and forty-five minutes, but

2

he had trouble staying in class the entire time, due to pain, and
he typically left after one hour. (R. at 324, 336.) He also
had problems concentrating on and finishing his homework
assignments due to his pain. (R. at 346.)

Mr. Hastings explained that he worked various jobs prior to
his injury, including work as a bus driver, janitor, and laborer.
(R. at 329.) His last employer was Cresthill Development Corp.,
a construction company, where he worked for about eighteen
months, doing work that usually involved heavy lifting. (R. at
327.) Following his injury, Mr. Hastings attempted to work on
two separate occasions. (R. at 326.) He returned to work with
Cresthill Development Corp., performing light duty work, such as
vacuuming drywall and other debris, but he had to stop working
after about three hours due to pain. (Id.). He also attempted
to work for his brother cleaning shovels and sweeping, but could
only work for four or five hours. (Id.) He testified that, the
following day, he experienced "real bad pain" and had
difficulties standing. (Id.) Since then, Mr. Hastings submitted
applications to various employers, but has not been able to
secure employment. (Id.).

Mr. Hastings testified that the date of his alleged onset of
disability was December 29, 2000 – the date that he injured his
back while carrying a load of heavy plywood beams at Cresthill.
(R. at 327-28, 355.) Following the injury, Mr. Hastings went

home and soaked in hot water. (R. at 328.) He did not believe that he could make it without treatment, and went to the emergency room at Silver Cross Hospital two days later, where he was told that he had torn ligaments. (R. at 328.)

Mr. Hastings testified that he had another work-related injury prior to this injury, which occurred while he was working as a bus driver. (R. at 329.) A vehicle collided with his bus, and he ended up with a herniated disc and whiplash. (Id.). Mr. Hastings also testified to having other health problems. (R. at 330, 332, 345.) He was having liver problems, because of some of the medication that he was taking. (R. at 330, 345.) In addition, Mr. Hastings reported having recurrent hernias; at the time of the hearing, he was experiencing a mild hernia on his left side, which would require surgery. (R. at 332.)

Mr. Hastings testified that he takes Naprosyn, a painkiller, and an unidentified muscle relaxant, but he tries to limit his intake, because they cause drowsiness and because he fears addiction. (R. at 325, 341, 345.) He testified that he cannot take the medication when he has to drive. On the days he has to travel, he will take the medication at night, otherwise he will take it in the morning. (R. at 325, 342.) He also testified that the medicine does not reduce the pain as much as he thought it would. (R. at 342.) Mr. Hastings' attorney added that Mr. Hastings had been prescribed several other kinds of medications

4

by his physicians at the Veterans Administration (VA), but Mr. Hastings explained that the physicians had advised him to stop using some of the stronger medications. (R. at 341-45.)

With respect to his daily activities and routines, Mr. Hastings testified that he lives alone in a trailer park and can take care of himself and his home. (R. at 333.) He testified, however, that he experiences severe pain after doing such household chores as vacuuming and after lifting and unloading bags of groceries. (R. at 333, 340.) He also has problems tying his shoes; he cannot lean down to tie them, but has to pull his feet up or put his feet on the table. (R. at 347.) Mr. Hastings also testified to having increasing difficulty in supervising his daughters, who visit him on the weekends, because he has trouble keeping up with them. (R. at 334.) His pain makes it difficult for him to concentrate on tasks, and he has problems sleeping - particularly, if he does not take his pain medication before 8:00 p.m. (R. at 332, 334, 340.) He testified, however, that he has no problems with depression, nervousness, or his appetite. (R. at 332.)

Mr. Hastings also testified regarding his functional capabilities. (R. at 330-32.) He testified that, if he sits for more than ten to twenty minutes, he experiences a throbbing, cutting pain. (R. at 330-31.) When he tries to get up from sitting, he experiences "real bad pain, aching" in the middle to

lower part of his back, which shoots through the side of his leg. (R. at 330.) He testified that he can walk for ten to twenty minutes, but that he has problems standing. (R. at 331). After about twenty minutes, he can hardly stand, and when he tries to sit down, he experiences severe pain. (Id.) He testified that he can climb a flight of stairs or stoop down only if he is holding onto something, and he can bend only to a certain point. (Id.) He can also lift up to 25 to 30 pounds. (R. at 332.)

Overall, Mr. Hastings testified that his situation is getting worse. (R. at 335.) He described how his pain is "really pinching, real bad." (Id.) Throughout the course of his treatments, Mr. Hastings testified, the pain notably increased and became sharper and more severe after using a TENS unit and going through work hardening programs, where he had to participate in upper and lower body-building exercises. (R. at 335, 348). Steroid injections to his lower back had virtually no effect, and physical therapy helped very little. (R. at 328, 352-53.) Mr. Hastings testified that one of his treating physicians, Dr. Rutkowski, concluded that Mr. Hastings was not a candidate for surgery. (R. at 336.)

## II. Medical History

Mr. Hastings' medical history prior to his December 2000 injury shows a 1989 work-related injury to his back, and problems with recurrent hernias on his right side. (R. at 108, 164, 174.)

6

An MRI of his lumbar spine taken in December 1989 revealed a herniated disc at the L3-L4 level. (R. at 174, 202.) Mr. Hastings was treated with medication, physical therapy, and a TENS unit, and his symptoms were reportedly resolved in 1992. (R. at 174.) Mr. Hastings also had three hernia surgeries between the ages of 6 to 36 years. (R. at 108, 164.)

## A. Dr. Abbasi: Silver Cross Hospital

Mr. Hastings injured his back on December 29, 2000. He was admitted to the Silver Cross Hospital emergency room on December 31, 2000. (See R. at 106-08; R. at 328.) Mr. Hastings complained of pain in the area of his lower back, left hip, and leg, and swelling to the hip area. He also complained that, when he leaned forward, he experienced shooting pain. (R. at 106-08.) The attending physician , Dr. Abbasi, diagnosed back pain and prescribed Mr. Hastings Naprosyn, a pain medication, and Flexeril, a muscle relaxant. (R. at 108.) Lumbar spine x-rays were reported to be negative for fracture, but showed a mild narrowing of the disc space at the L5-S1 level. (R. at 110.)

## B. Dr. Shah

From January 2001 to March 2001, Mr. Hastings received treatment from Dr. Yatin Shah, an internist. (See R. at 102, 162-79, 244.) On January 10, 2001, Mr. Hastings told Dr. Shah that he had a "dull, nagging pain which is continuous and getting worse on prolonged standing and ambulation." (R. at 174.) He

reported that he had difficulty with his daily activities and sleeping at night. (Id.) Mr. Hastings did not report any radiation of pain, numbness, or weakness of his lower extremities. (Id.) Mr. Hastings also indicated that he had taken some medication, which did not relieve his pain. (Id.) Dr. Shah examined Mr. Hastings and observed a paravertebral muscle spasm in the lumbar-sacral spine area, with limitation of flexion. (R. at 175.) He also observed normal range of motion and strength in both of his legs, along with normal gait. (Id.) Dr. Shah diagnosed lumbosacral strain, a herniated disc on the lumbar spine area, and a hernia on the right side of the groin. Dr. Shah prescribed Naprosyn and Robaxin. (Id.)

Dr. Shah ordered an MRI of Mr. Hastings' lumbar spine, taken on January 11, 2001, which showed that there was marked degeneration of the right side of the disc and mild diffuse protrusion of the disc at the L5-S1 level. (R. at 173). Results also showed that a mild right neuroforaminal stenosis had developed from the combination of the disc degeneration and protrusion. (Id.)

Dr. Shah concluded in an initial work status report dated January 10, 2001 that Mr. Hastings was unable to work. (R. at 176.) On Mr. Hastings' follow-up visit on January 19, 2001, Dr. Shah prescribed continued use of medication in addition to physical therapy treatments. (R. at 171.) By February 19, 2001,

Dr. Shah reported that Mr. Hastings could do light duty work, with the restrictions of lifting no more than 30 pounds, no pushing or pulling, and minimum walking, sitting, bending, and stooping. (R. at 169.) By the end of his treatment, Dr. Shah indicated that Mr. Hastings was unable to work and referred him to a work hardening program, which, Mr. Hastings later testified, exacerbated his pain. (R. at 163, 165, 167, 348.)

## C. Physical Therapy at Primary Care Joliet

In January 2001, Mr. Hastings completed his initial physical therapy evaluation, and he complained of constant pain to the lumbar region from the L1 to S1 level. (R. at 158.) He stated that his pain was at its worst when he was sitting or standing in one place for more than a couple of minutes. (*Id.*) He did not complain of radiating pain in his legs. (R. at 159.) He also indicated that he had trouble sleeping and finding a comfortable position. (R. at 158.) The evaluating therapist observed the presence of a moderate to severe paravertebral muscle spasm, limited lumbar range of motion, and limited straight leg raising. (R. at 159.)

Mr. Hastings underwent physical therapy from January to March 2001 and completed twenty-five sessions of physical therapy, which consisted of heat treatments, interferential treatments, therapeutic exercises and therapeutic massages for his lower back. (R. at 111; see R. at 111-61). He was also

9

provided with education to avoid reinjury to his back. (R. at
111.) He was discharged from physical therapy on March 16, 2001,
and the evaluating therapist noted some progress in Mr. Hastings'
condition. (*Id.*) The therapist reported that Mr. Hastings'
complaints of lower back pain and radiating symptoms decreased
from constant to intermittent, and his subjective pain level
decreased from an eight to a one or two out of ten, with ten
indicating the highest level of pain. (*Id.*) The therapist
recommended that Mr. Hastings continue activities to increase
lower back mobility and that he avoid excessive straining to his
lower back. (*Id.*) Mr. Hastings told the evaluating therapist
that when he was "able to take it easy," his pain was around a
three to four out of ten and that "the pain medication makes it
so I don't feel it at all." (*Id.*)

**D. Physical Therapy at Provena St. Joseph Medical Center**

Following the request of Dr. Lenard Rutkowski, a
neurosurgeon, Mr. Hastings underwent additional physical therapy
treatments from May to June 2001, and completed a total of
twenty-four therapy sessions, with minimal progress. (*See* R. at
181-197.)

In May 2001, Mr. Hastings completed twelve therapy sessions,
which consisted of a back rehabilitation program with dynamic
lumbar stabilization, stretching, and strengthening, as well as
gait training on a treadmill. (R. at 188.) The evaluating

10

therapist reported that Mr. Hastings was still experiencing radiating pain from his lower back into his right buttocks. (*Id.*) He observed limited lumbar range of motion, with a decrease in flexion by 20% and a decrease in his right and left side-bending motion by 25%; the therapist observed normal extension. (*Id.*) He also observed 4/5 muscle strength in both of Mr. Hastings' legs. (*Id*). The therapist indicated that Mr. Hastings had made minimal progress and questioned the efficacy of therapy. (*Id.*) Mr. Hastings reported that he was periodically sore following physical therapy treatment, and the therapist observed that Mr. Hastings was still walking with a painful gait following therapy. (*Id.*)

In June 2001, Mr. Hastings completed twelve additional treatments, which consisted of strengthening and stretching exercises for his trunk and lower extremities and endurance enhancing exercises. (R. at 181.) Mr. Hastings complained of lower back pain and reported that he had been using a TENS unit, which increased his pain. (*Id.*) The therapist noted that Mr. Hastings' progress did not seem to be improving at any significant rate. (*Id.*) Mr. Hastings stated that he intended to attend a pain clinic and was unsure as to whether he would be continuing with physical therapy. (*Id.*)

### E. Dr. Rutkowski

Mr. Hastings went to Dr. Rutkowski for further treatment. (See R. at 181-201, 243.) In a July 18, 2001 spinal disorder report, Dr. Rutkowski diagnosed Mr. Hastings with lower back pain and degenerative disc disease. (R. at 200.) Dr. Rutkowski observed unassisted ambulation, no atrophy, normal straight leg raising, and normal extension, but rather limited flexion of the lumbosacral spine. (R. at 200-01). The report also indicated that Mr. Hastings had a paravertebral muscle spasm. (R. at 201). Dr. Rutkowski noted that Mr. Hastings was not a candidate for surgery. (Id.)

Mr. Hastings testified that Dr. Rutkowski had told him that surgery would not help, but would only cause "more trouble, more pain." (R. at 336.) Mr. Hastings also testified that Dr. Rutkowski indicated that he could no longer do any work as a laborer because "it's just only going to get worse." (Id.) Mr. Hastings testified that he stopped seeing Dr. Rutkowski after the doctor informed him that there was nothing more that he could do for him. (R. at 335-36).

### F. VA Clinic

Mr. Hastings also received ongoing treatment from the VA clinic, starting from July 2001 through November 2002. (See R. at 208, 219, 323, 354). At the time of the hearing, Mr. Hastings testified that he had also visited the VA clinic once in March

12

2003, and was scheduled to receive a steroid injection in May 2003. (See R. at 323, 354).

In November 2001, Mr. Hastings complained of sharp back pain, which was made worse by lifting, and was relieved by lying on his back. (R. at 216, 292.) Mr. Hastings similarly complained in December 2001 of lower back pain, which continually radiated down his right leg. (R. at 210, 263.) He reported that his pain was made worse by sneezing, bending, and sitting for prolonged periods, and was relieved by lying on his back. (Id.) He was diagnosed with chronic lower back pain, with right radiculopathy, right sacrioiliac joint arthropathy, and post inguinal herniorrhaphy pain. (R. at 211, 264). Mr. Hastings was prescribed pain medication. (Id.)

In February 2002, Mr. Hastings complained of severe pain to his back, with weakness and limited range of motion to his back and lower extremities. (R. at 232, 284.) His physical examination revealed that he had 4/5 muscle strength in his legs and a limited range of motion to his lower back and lower extremities. (R. at 234, 285.) He was diagnosed with degenerative disc disease. (Id.)

On February 11, 2002, Mr. Hastings complained of lower back pain, radiating into his right calf, and he complained that his pain was worse than it was at his last MRI in January 2001. (R. at 235, 287.) The treating physician ordered another MRI of his

lumbar spine. (*Id.*) The March 4, 2002 MRI showed that Mr. Hastings had an annular rent at the L3-L4 level, and a broad-based disc herniation at the L5-S1 level. (R. at 228, 230-31.) Upon review of the MRI, the physician recommended that Mr. Hastings continue his present pain management. (R. at 229).

In June 2002, Mr. Hastings complained of lower back pain that radiated down his right thigh to his toes. (R. at 260.) Mr. Hastings also indicated that he took Naprosyn as needed, which helped to reduce pain. (*Id.*) Results from a physical exam revealed no signs of atrophy or spinal tenderness, normal straight leg raising, slightly antalgic gait, 5/5 muscle strength in his legs, and the presence of a paraspinal muscle spasm. (R. at 261). Mr. Hastings agreed to continue his home exercise program and to try a chronic pain program and clinic. (*Id.*)

In July 2002, Mr. Hastings reported having shocking, stabbing pain in his lower back that radiated to his right buttocks and thigh and that his right leg was weak and buckled when he sneezed. (R. at 251, 256.) He noted that his pain improved when he was lying on his back or sitting with his legs elevated. (*Id.*) He also indicated that some pain medication helped to reduce pain, but caused drowsiness. Mr. Hastings did not take his medications consistently, because he thought they were to be taken as needed. (*Id.*) Treatment records showed no muscle atrophy, normal gait, but unable to walk on his heels and

toes, some tenderness in his lumbar spine, and 5/5 muscle
strength in his legs, with some pain limitations in his right hip
flexors. (R. at 252, 257.)

Mr. Hastings was diagnosed with chronic pain syndrome, and
the physician noted decreased strength, decreased endurance,
sleep disturbance, inability to manage stress, impaired coping
strategies, impaired self-care skills, impaired mobility along
with medication management issues. (R. at 253, 258.) The
evaluating physician recommended that Mr. Hastings participate in
a pain rehabilitation and education program (PREP) for six weeks,
which consisted of education on coping strategies, relaxation
techniques, the pathophysiology of pain and the pain cycle to
treat his chronic lower back pain. (Id.)

Prior to participation in PREP, Mr. Hastings underwent an
initial evaluation by a clinical pharmacist from the pain clinic.
(R. at 282-83). The pharmacist noted that Mr. Hastings' pain was
"not controlled due to not taking medications." Mr. Hastings
reported that he did not take his medications to avoid building a
tolerance for it. (R. at 283.) He also reported that he took
his medications as needed and only took two tablets of aspirin
daily. (Id.) Mr. Hastings was educated on the necessity of
taking his medications as prescribed, and consequently, he stated
that he was willing to try prescribed medications to reduce the
pain. (Id.)

Mr. Hastings began attending PREP in October 2002, and completed the program in November 2002. (See R. at 266-79; R. at 354-55.) Treating professionals noted that Mr. Hastings had made a good effort to attend sessions at the pain clinic over the course of the program. (R. at 266.)

In October 2002, PREP evaluations indicated that Mr. Hastings reported that he discontinued use of some medications, because it caused grogginess, and that he did not take his medications consistently. (R. at 275, 277.) Treatment records showed that Mr. Hastings had no muscle atrophy and a normal gait, but that he was unable to walk on his heels and toes. Mr. Hastings had 5/5 muscle strength in his legs, with some pain limitations in his hip flexors. (Id.)

In November 2002, Mr. Hastings' diagnosis of pain syndrome was confirmed. (R. at 266.) PREP reports also indicated that Mr. Hastings was doing his own repair work at home and tended to overdo activity, as a result of limited social supports and financial resources. (R. at 270, 273.) Treating professionals noted that Mr. Hastings was still with pain, and that he took pain medication when the pain was severe, which was effective. (R. at 267). The treating professionals noted that Mr. Hastings continued to tolerate the PREP program and that he reported that his pain was five to six out of ten most days throughout the

program. (*Id.*) They advised Mr. Hastings to avoid strenuous
activities. (*Id.*).

Results from a physical examination showed no atrophy,
normal but slow and antalgic gait, mild tenderness and tightness
in his lumbosacral paraspinal muscles, and 5/5 muscle strength in
both legs, with some pain limitations in his hip flexors. (R. at
268.) An evaluating physical therapist noted that Mr. Hastings
underwent numerous therapies, including TENS trial and a home
exercise program, which worsened his condition. (R. at 270.)
The therapist determined that Mr. Hastings was not likely to
benefit from physical therapy. (*Id.*)

Mr. Hastings had expressed increasing financial concerns and
difficulties in September 2002, and indicated that he was
interested in being evaluated for work training. (R. at 280).
Mr. Hastings was no longer collecting unemployment compensation,
and was receiving some financial assistance through the Veterans
Assistance Commission. (R. at 247, 280.) He met with a social
worker in November 2002, who discussed the possibility of
pursuing vocational options other than manual labor. (R. at 247.)
The social worker recommended that Mr. Hastings obtain a GED.
(*Id.*).

### G. Dr. Morales

In November 2001, Dr. Rutkowski referred Mr. Hastings to Dr.
Mauricio Morales, a pain management specialist and

anesthesiologist. (R. at 208, 242). Dr. Morales noted that Mr. Hastings had a history of chronic back pain, with degenerative disease, and had been treated with epidural steroid injections, which reportedly had no effect on his symptoms. (R. at 208.) Dr. Morales referred to an MRI, which showed mild degenerative disc disease, and concluded that he "cannot explain the great degree of pain that [Mr. Hastings] is complaining of." (*Id.*) Dr. Morales recommended adjusting Mr. Hastings' medication. (*Id.*) Dr. Morales also noted that Mr. Hastings had visited a neurosurgeon at the VA hospital for a second opinion. (*Id.*)

## H. Functional Capacity Evaluation

In September 2001, Mr. Hastings underwent a functional capacity evaluation upon Dr. Rutkowski's referral. (R. at 203.) The test consisted of approximately four hours of standardized testing and two and one-half hours of functional task performance, which Mr. Hastings testified consisted of tests such as climbing a flight of stairs, pushing a cart full of blocks, walking on a beam, and screwing and unscrewing bolts into a pallet. (R. at 203, 348, 351.)

The therapist observed that, during the exam, Mr. Hastings was exerting moderate to maximum effort, and determined that Mr. Hastings was functioning at a light-medium work level, with the ability to lift a maximum of 35 pounds from the floor to his shoulders. (R. at 203.) The therapist noted that the work level

was representative of performance in two-handed frequent lifting only, and not in any other functional area. (*Id.*) The therapist further noted that Mr. Hastings' musculoskeletal status may moderately "limit his ability to perform functional activities" and recommended that the "positions of stooping and twisting should be either decreased or eliminated in the interest of proper body mechanics." (*Id.*)

The results of the exam revealed several weaknesses in Mr. Hastings' musculoskeletal status and some functional limitations. (R. at 204, 205.) Results indicated that Mr. Hastings had decreased trunk flexion, weakness in his lower legs for hip flexion and knee extension, and weak abdominal muscles. (R. at 204.) The therapist observed that Mr. Hastings had decreased tolerances for sustained crouching, sustained standing, and getting up from prolonged kneeling and balancing. Mr. Hastings had to hold onto stationary objects to get up from lower level positions. (*Id.*) The therapist observed that Mr. Hastings walked at a fair pace that decreased over time; he could tolerate a "walk/climb circuit" of 21 minutes. (*Id.*) Mr. Hastings could also climb 14 flights of stairs, with increased respiration after four continuous flights. (*Id.*) Mr. Hastings could lift for a maximum up to 35 pounds from floor to shoulder and 20 pounds over his head, lifting with two hands. (*Id.*) But, he had increased difficulty with lifting objects above his chest; he also had to

take breaks or switch hands for above shoulder reaching activities. (R. at 204, 205.) He could also push/pull a cart carrying up to 500 pounds with two hands. (R. at 204.) The evaluator also indicated that Mr. Hastings demonstrated no difficulties in sitting, reclining, reaching horizontal and below the waist, and with manual dexterity. (R. at 205.)

The therapist noted that Mr. Hastings complained frequently throughout the exam of discomfort to his left lower back and left leg. (Id.) Mr. Hastings similarly testified during his hearing that he experienced "real bad pain" during the exam, at a level of nine out of ten, and ended up taking medicine during his lunch break to alleviate the pain. (R. at 349-51.) Mr. Hastings testified that he did not agree with the recommendation that he could do work, because he believed that the exam results were affected by the fact that he took medicine. (R. at 351). He informed the test administrators that he did not know he was not allowed to take medication during the exam, but ended up doing so to alleviate his pain. (Id.) He testified that they responded that Mr. Hastings had to resolve the matter with his doctor, and that they were not going to change the record. (Id.)

## I. SSA Physicians: Residual Functional Capacity Assessment

In October 2001, Dr. Bergmann, an SSA physician, reviewed Mr. Hastings' medical records and completed a residual functional capacity assessment ("RFC") for Mr. Hastings. (See R. at 220-

27.) He reported that Mr. Hastings could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds and sit, stand, or walk with normal breaks for six hours out of an eight-hour workday. (R. at 221.) He also reported that Mr. Hastings was restricted to occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (R. at 222.) Another SSA physician, Dr. Vincent, subsequently reviewed the record and agreed with Dr. Bergmann's opinion. (R. at 220.)

Based on this RFC, Philip Marks reported in his reconsideration disability report that Mr. Hastings was limited to light work activity. (R. at 91). Mr. Marks listed examples of jobs that could be performed by persons with these functional limitations: pan greaser, core extruder for electrical equipment, and conveyor loader II for meat processing. (Id.)

## II. The April 16, 2002 Decision of ALJ Mondi

The ALJ found that Plaintiff was not disabled as defined by the Social Security Act, and denied his claim for DIB and SSI. (R. at 14-5.) The ALJ first determined that Plaintiff had not performed any substantial gainful work since the alleged onset of disability. (R. at 13.) Although Plaintiff had briefly attempted to work on two separate occasions, the ALJ concluded that these attempts were not indicative of substantial gainful activity. (Id.) The ALJ found that Plaintiff had a back disorder and a recurrent hernia that qualified as severe impairments under

Social Security Regulations, but he found that Plaintiff's allegations of pain, symptoms, and disabling limitations were not credible. (*Id.*) The ALJ's credibility finding was based on the results of an October 2002 medical examination that showed no atrophy and normal strength in both legs, with some pain limitations in the right hip; Plaintiff's inconsistent use of prescribed medications; and his activities, that included looking for other work. (R. at 13.)

The ALJ determined that Plaintiff had a RFC for a restricted range of light work. (R. at 14-5.) The ALJ found that Plaintiff had the RFC to engage in work that required lifting up to 20 pounds occasionally and 10 pounds frequently, as well as sitting, standing, and/or walking, with normal work breaks for six hours in an eight-hour workday, with the limitations of no more than occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (*Id.*)

Given Plaintiff's RFC, the ALJ concluded that Plaintiff could engage in his past relevant work as a bus driver, which is performed at the sedentary level. (*Id.*) Further, the ALJ noted that, according to the Regulations, the functional capacity to perform light work indicates the functional capacity to perform sedentary work. (R. at 14.) The ALJ found that an extensive occupational base of jobs involving sedentary and light unskilled work existed in the national economy. (*Id.*) Even given

Plaintiff's nonexertional limitations, there would be a
significant number of jobs in the economy that Plaintiff could
perform. *(Id.)*

## Standard of Review

The reviewing court must affirm the ALJ's decision if the
ALJ's factual findings are supported by substantial evidence and
the ALJ has made no errors of law. *Clifford v. Apfel*, 227 F.3d
863, 869 (7th Cir. 2000). Substantial evidence refers to "such
relevant evidence as a reasonable mind might accept as adequate
to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402
U.S. 389, 401 (1971)). In its review of the ALJ's decision, the
Court may not decide facts anew, reweigh the evidence, resolve
evidentiary conflicts, decide questions of credibility, or
substitute its judgment for that of the ALJ. *Young v. Barnhart*,
362 F.3d 995, 1001 (7th Cir. 2004); *Herron v. Shalala*, 19 F.3d 329,
333 (7th Cir. 1994). This does not mean, however, that the Court
"simply rubber-stamp[s]" the ALJ's decision, but it must
critically review the entire administrative record. *Clifford*, 227
F.3d at 869.

Not only must the ALJ's decision be based upon a
consideration of all relevant evidence, but the ALJ must
adequately articulate the grounds for his decision to show that
the ALJ considered all of the important evidence and to "enable
[the Court] to trace the path of [the ALJ's] reasoning." *Scott v.*

*Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ must "build an accurate and logical bridge from the evidence to [his] conclusion." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

While the Court does not require the ALJ to provide a written evaluation of every piece of evidence or testimony, the ALJ may not select and discuss only the evidence that favors his final conclusion. *Herron*, 19 F.3d at 333. The ALJ must articulate reasons for "accepting or rejecting entire lines of evidence." *Id.* When the ALJ fails to mention rejected evidence, the "reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984) (quoting *Cotter v. Harris*, 642 F.2d 700,705 (3d Cir. 1981)).

A case must be remanded if the ALJ's decision is not properly supported by substantial evidence or is so poorly articulated to prevent meaningful review. *Steele*, 290 F.3d at 940.

## Social Security Regulations

The Social Security Regulations prescribe a sequential five-step test to determine whether a claimant is disabled. 20 C.F.R. §404.1520. The ALJ must determine whether the claimant: (1) is currently unemployed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals one of

the impairments listed in the Regulations as being so severe as to preclude gainful activity; (4) is unable to perform his past relevant work; and (5) is unable to perform other work in the national economy in light of his age, education, and work experience. *Young*, 362 F.3d at 1000; 20 C.F.R. § 404.1520.

A negative answer at any step other than step three stops the inquiry and precludes a finding of disability. *Orlando v. Heckler*, 776 F.2d 209, 212 (7th Cir. 1985). If the ALJ's inquiry leads to a negative answer at step three, then the ALJ must consider an assessment of the claimant's residual functional capacity (RFC) in his determination at steps four and five. *See Young*, 362 F.3d at 1000. A claimant's RFC is an assessment of the work-related tasks the claimant can perform despite his limitations. *Id.*

An affirmative answer in the ALJ's analysis leads to the next step, except in the case of steps three and five, which leads to a finding of disability. *Orlando*, 776 F.2d at 212. If the ALJ can make a conclusive finding that the claimant either is or is not disabled at any step, then the ALJ does not need to progress to the next step. *Young*, 362 F.3d at 1000. The claimant bears the burden of proof at steps one through four. *Id.* The burden shifts to the ALJ at step five to show that the claimant has the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## Discussion

Plaintiff argues that the ALJ's decision is not supported by substantial evidence and must be reversed due to several procedural errors. (Pl. Mem. at 8-9.) First, Plaintiff argues that the ALJ disregarded significant portions of the record, particularly treatment evidence, and relied only on evidence that favored his ultimate conclusion. (Pl. Mem. at 9.) Next, Plaintiff argues that the ALJ's conclusion that he can return to past relevant work is neither supported by substantial evidence nor properly explained in the decision. (Pl. Mem. at 11.) Plaintiff also argues that the ALJ erred in concluding that his testimony was incredible, and, consequently, failed to consider the impact of pain, the side effects of medication, and postural limitations on his ability to work. (Pl. Mem. at 12.) Lastly, Plaintiff argues that the ALJ erred in concluding that he was capable of light work. (Pl. Mem. at 14.) The Court will consider each argument in turn.

### I.    Treatment Evidence

Plaintiff principally argues that the ALJ failed to consider all of the evidence in the record, particularly treatment records that did not support the ALJ's ultimate conclusion, and that the ALJ failed to articulate a reason for disregarding the evidence. (Pl. Mem. at 9-10.) Plaintiff first contends that the ALJ "barely mention[ed]" results from MRIs taken in January 2001 that

showed marked disc degeneration at the L5-S1 level and mild disc protrusion, and again in March 2002 that showed an annular rent at the L3-L4 level and broad-based disc herniation at the L5-S1 level. (*Id.*) Plaintiff also argues that the ALJ disregarded other significant information from the treatment records, including records documenting the extent of his treatment, and that the ALJ gave "short shrift" to the physical therapy and VA treatment records as a whole – particularly to the portions that tend to support Plaintiff's claims of pain and functional limitations. (Pl. Mem. at 10.) Lastly, Plaintiff argues that the ALJ improperly disregarded Dr. Shah's opinions discussing Plaintiff's ability to work. (*Id.*) Plaintiff contends that Dr. Shah's opinion, or any other evidence from treating sources, can not be disregarded by the ALJ without articulating any grounds for doing so. (*Id.*)

Plaintiff correctly points out that the ALJ must consider all relevant evidence and may not ignore evidence that supports Plaintiff's claim. *See Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir., 1984); *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982). Moreover, the ALJ may not select and discuss only the evidence that favors his ultimate conclusion, but the analysis should show that the ALJ considered all of the important evidence. *Id.* The ALJ is not required to provide a written evaluation of every piece of evidence in the record. *Id.* But,

the Seventh Circuit requires a "minimal level of articulation of
the ALJ's assessment of the evidence . . . in cases in which
considerable evidence is presented to counter the agency's
position." *Zblewski,* 732 F.2d at 79. The ALJ is also required to
articulate the grounds for rejecting entire lines of evidence.
*Herron,* 19 F.3d at 333.

In the instant case, the ALJ failed to fulfill his duty in
this regard. With the exception of Plaintiff's MRI results, the
ALJ failed to address competing lines of evidence that lends
support to Plaintiff's claim.

Initially, the Court rejects Plaintiff's claim that the ALJ
improperly disregarded the favorable findings revealed in his MRI
results. The ALJ did discuss Plaintiff's MRI results, albiet
briefly. However, the Seventh Circuit does not require a more
extensive or detailed discussion. The Seventh Circuit has
interpreted the requirement of a "minimal level of articulation"
as "enough to show that the ALJ considered the evidence the law
requires him to consider." *Stephens v. Heckler,* 766 F.2d 284,
287 (7th Cir. 1985). Here, the ALJ did not treat the results as
being generally unremarkable, but rather, the ALJ noted that the
results showed "significant back pathology." (R. at 13.)
Further, the ALJ discussed the reasons for not giving greater
weight to the MRI results, pointing to the results of the October
2002 examination conducted at the VA clinic, Plaintiff's

inconsistent use of prescribed medications, and his daily activities, including looking for work. (*Id.*) The Court does not believe that the ALJ's limited description of the MRI results constitutes an error requiring remand.

The Court, however, agrees with Plaintiff that the ALJ failed to address relevant treatment records documenting the extent of treatment undertaken by Plaintiff to relieve pain. In particular, the ALJ did not address the results from Mr. Hastings' extensive physical therapy treatments undertaken from January to March 2001, and again in May to June 2001, per the recommendation of his treating physicians, Drs. Shah and Rutkowski. (R. at 111, 181, 188.) Mr. Hastings underwent a total of 49 sessions, and the ALJ does not discuss the therapy results and the observations of the evaluating therapists, which documented various abnormalities, like paravertebral muscle spasms and limited lumbar range of motion, along with his complaints of pain and functional limitations. (R. at 111, 158-60, 181, 183, 188, 192-97.)[1]

Similarly, the Court agrees with Plaintiff that the ALJ provided an incomplete discussion of his treatment undertaken at the Edward Hines VA clinic. Mr. Hastings underwent treatment at

[1]Although March 2001 physical therapy reports indicate that Plaintiff's condition improved with physical therapy, subsequent physical therapy reports from May to June 2001 note Plaintiff's minimal progress after treatment. (R. at 111, 181, 188.)

the VA clinic from July 2001 until the time of the hearing (See R. at 209-241, 321-24). The ALJ, however, only referred to notations from treatment received in April and October 2002. (R. at 13-4.) The ALJ observed that the October 2002 exam results were noteworthy for findings of no atrophy and normal strength in both legs, with some pain limitation of the right hip. (Id.) The ALJ also noted that the April and October 2002 findings refer to Plaintiff's inconsistent use of pain medications. (R. at 13.)

However, the ALJ did not discuss the evidence from the VA clinic treatment records that support Plaintiff's claims of pain and disability, including a diagnosis of degenerative disc disease, objective findings of limited lumbar range of motion and paraspinal muscle spasms, noted ineffectiveness of therapeutic treatments to relieve pain, and Plaintiff's persistent subjective complaints of pain and functional limitations. (See e.g., R. at 210, 211, 232, 234, 251, 253, 261, 266, 270, 285, 291.)

The Court does not require the ALJ to discuss reasons for rejecting each report from the VA clinic. However, the Court does require the ALJ to explain, at a minimal level, his reasoning for rejecting lines of evidence that support Plaintiff's claim. It is the ALJ's role to weigh evidence and decide which evidence is most persuasive, but the ALJ must explain the reasoning behind the weight given to the evidence.

*Farrell v. Sullivan*, 878 F.2d 985, 989 (7th Cir., 1989). The ALJ
is not permitted to pick and choose among the evidence and ignore
evidence supporting Plaintiff's claims. *See* Herron, 19 F.3d at
333.

Plaintiff also argues that the ALJ disregarded Dr. Shah's
opinion as to Plaintiff's ability to work. (Pl. Mem. at 10.)
The Commissioner argues that Dr. Shah's opinion is not entitled
to any special significance, because it is an opinion on an issue
reserved for the Commissioner. (Def. Mem. at 11.) But,
Plaintiff is not arguing that the ALJ improperly weighed Dr.
Shah's opinion, rather, Plaintiff is arguing that Dr. Shah's
opinion was improperly ignored without articulating any reasons
for doing so. (Pl Mem. at 10.)

Here, the ALJ did not address Dr. Shah's findings nor
articulate any reasons for discounting the treating physician's
evidence. *Compare Edwards v. Sullivan*, 985 F.2d 334, 337 (7th
Cir. 1993) (ALJ provided grounds for rejecting treating
physician's opinion and Court held ALJ properly discounted
treating physician's opinion because of lack of medical
evidentiary support) and *Clifford*, 227 F.3d at 870 (Court held
that ALJ improperly evaluated the evidence because ALJ failed to
explain treating physicians' opinions were necessarily
inconsistent with other medical evidence in the record). Dr.
Shah's medical findings not only include work status reports, but

also include objective medical findings of a paravertebral muscle spasm and limited lumbar flexion and diagnoses of a lumbosacral strain, inguinal hernia on the right side, and a herniated disc in the lumbar-spine area. (R. at 175.) Even though the Commissioner may point to various reasons to support the ALJ's decision to give little weight to Dr. Shah's opinion, the Court's review is confined to the ALJ's analysis. *Steele*, 290 F.3d at 941. The ALJ should examine what weight, if any, to give to Dr. Shah's findings on remand. *See* 20 C.F.R. §404.1527(d)(2) ("We will always give good reasons ... for the weight we give your treating source's opinion."). The ALJ also should address the medical findings of Plaintiff's other treating physician, Dr. Rutkowski.

The Commissioner argues that the ALJ's summary of Plaintiff's testimony constitutes consideration of the extent of Plaintiff's treatment and the opinions of treating physicians. (*See* Def. Mem. at 10-1.) But the Court does not agree that merely describing Plaintiff's testimony permits informed judicial review. Because the ALJ's decision does not even mention or discuss evidence from the treating sources that support Plaintiff's claim, the Court is unable to track the ALJ's reasoning and is not assured that the ALJ did, in fact, consider all the relevant evidence in his analysis. The ALJ should

examine what weight to give to the evidence from these treating sources upon remand.

## II. Past Relevant Work

Plaintiff next argues that the ALJ erred in determining that Plaintiff can return to his past work as a bus or truck driver. (Pl. Mem. at 11.) Plaintiff contends that the ALJ failed to consider the specific functional demands associated with these jobs, and failed to relate those functional demands to Plaintiff's present capabilities. (*Id.*) Plaintiff argues that the record demonstrates that he can not sit for prolonged periods of time, and that he takes medication that causes drowsiness – conditions that would preclude Plaintiff from engaging in work as a driver. (Pl. Mem. at 11-2.)

In *Strittmatter v. Schweiker,* 729 F.2d 507, 509 (7th Cir. 1984), the Seventh Circuit held that an ALJ has to determine the demands of the claimant's past work, and then compare those demands to the claimant's existing physical abilities. Here, the ALJ determined that Plaintiff is capable of sitting, with normal work breaks, for about six hours in an eight-hour workday. (R. at 14.) Thus, he logically concluded that the duties of Plaintiff's previous jobs are within his residual functional capacity. Plaintiff also argues that the side effects of his medications would preclude him from working as a driver. (Pl. Mem. at 11-2.) However, the ALJ noted Plaintiff's inconsistent

use of medicine as a reason for discounting Plaintiff's credibility. (R. at 13.)

Given the ALJ's RFC finding, the Court would agree that the ALJ's conclusion that Plaintiff could return to his past work was reasonable.[2] Plaintiff argues he is unable to sit for prolonged periods of time, but that is not what the ALJ found differently.[3]

(Pl. Mem. at 11; see R. at 13-4.) Further, Plaintiff only makes a general statement regarding Plaintiff's ability to sit for prolonged periods, and does not point to any specific evidence in the record to support his argument. (See Pl. Mem. at 11.) While the ALJ did not specifically describe the functional demands associated with a job as a truck or bus driver, and explain how Plaintiff is capable of meeting those demands, the Court does not believe that the ALJ needs to provide a more detailed explanation in order to build a logical bridge between the evidence and the result.

---

[2] Plaintiff also argues that the job of a truck or bus driver is not a sedentary job, but rather, implies that these jobs constitute light work. (See Pl. Mem. at 12, n.1.) Even if these jobs fall within the category of light work, the ALJ can still logically conclude that Plaintiff can return to past relevant work, given the ALJ's RFC finding that Plaintiff is capable of a restricted range of light work. Whether the ALJ's RFC is still supported by substantial evidence once the ALJ reconsiders Plaintiff's claim in light of overlooked evidence is another matter.

[3] The Court agrees with the Commissioner that the Plaintiff is, in essence, questioning the ALJ's RFC finding. The Court will wait to address this argument until its discussion of the ALJ's determination of Plaintiff's ability to do light work, where Plaintiff questions more directly the ALJ's RFC finding.

## III. **Credibility Determination**

Plaintiff next argues that the ALJ's credibility determination was erroneous, because he did not consider the entire record when assessing Plaintiff's credibility. (Pl. Memo at 12-4.) Plaintiff argues that the ALJ ignored several factors in the record supporting his claims of subjective pain and functional limitations, including: 1) physicians' adjustment of Plaintiff's medication in response to complaints of medication side effects; 2) significant treatment that Plaintiff pursued over time for his lower back pain; 3) objective documentation of a condition that is likely to produce pain; and 4) evidence in the record demonstrating Plaintiff's inability to sit, stand, or walk for prolonged periods of time and side effects from medication. (Pl. Memo at 12-14.) Plaintiff argues that the ALJ impermissibly relied on isolated portions of the record - normal findings from an October 2002 VA exam, Plaintiff's inconsistent use of medications, and Plaintiff's daily activities, including looking for work - to conclude that Plaintiff's statements are incredible. (Pl. Memo at 14.)

An ALJ's credibility determination will not be disturbed unless it is patently wrong. *Luna v. Shalala*, 22 F.3d 687, 690 (7th Cir. 1994). Courts give an ALJ's credibility determinations special deference, because the ALJ is in the best position to observe the witness. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th

Cir. 2000). Pursuant to Social Security Ruling (SSR) 96-7p, the ALJ must set forth specific reasons for a credibility finding, supported by evidence in the record, and "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals' statements and the reason for that weight." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir., 2001). A single, conclusory statement about the claimant's credibility such as "the individual's allegations have been considered" does not sufficiently explain the ALJ's decision. *Id.* It is also not enough for the ALJ to simply recite the factors that are described in the regulations for evaluating symptoms. *Id.* Credibility determinations play a critical role in determining the weight to give a claimant's subjective complaints of pain. In evaluating a claimant's subjective complaints of pain, the ALJ must first determine whether the allegations of pain are supported by objective medical evidence. *Luna*, 22 F.3d at 691; 20 C.F.R. §404.1529. While the ALJ may discount subjective complaints of pain that are inconsistent with the evidence as a whole, the ALJ may not disregard those complaints merely because they are not fully supported by objective medical evidence. *Knight v. Chater, 55 F.3d 309, 314 (7th Cir., 1995).* The absence of objective medical evidence supporting an individual's

statement is just one factor to be considered. *Id.* The Seventh

Circuit has instructed:

> If the allegation of pain is not supported by the objective
> medical evidence in the file and the claimant indicates that
> pain is a significant factor of his or her alleged inability
> to work, then the ALJ must obtain detailed descriptions of
> claimant's daily activities by directing specific inquires
> about the pain and its effects to the claimant. *Luna*, 22
> F.3d at 691. [The ALJ] must investigate all avenues
> presented that relates to pain, including claimant's prior
> work record, information and observations by treating
> physicians, examining physicians, and third parties.

*Id.*

The factors the ALJ must consider include the following: (1)

the location, duration, frequency, and intensity of the pain; (2)

precipitating and aggravating factors; (3) type, dosage,

effectiveness, and side effects of any pain medication; (4)

treatment other than medication for relief of pain; (5)

functional limitations and restrictions; and, (6) the claimant's

daily activities. *Knight*, 55 F.3d at 314; *Luna*, 22 F.3d at 691; 20

C.F.R. §404.1529(c)(3).

The Court finds that the ALJ's credibility determination

falls short, because he overlooked relevant pieces of evidence

that could support Plaintiff's claims of pain. The Court

addresses each factor, and the relevant evidence, in turn.

First, the Court agrees that the ALJ should have considered

the side effects of Plaintiff's medication in his credibility

analysis. However, the Court does not agree that the adjustment

of medication by the doctors necessarily lends support to the credibility of Plaintiff's complaints of disabling pain. Plaintiff argues that his credibility is supported by the doctor's willingness to adjust his medications, but this factor is not outlined in the Regulations as one of the factors to be contemplated by the ALJ in his analysis. See 20 C.F.R. §404.1529(c)(3). Rather, the ALJ is required to consider the side effects of medication. See Id.

Second, the Court agrees that the ALJ improperly disregarded the extent of treatment Plaintiff underwent to control and manage his pain. One of the factors to be considered by the ALJ in his credibility determination is treatment the Plaintiff receives for relief of pain other than medication. Knight, 55 F.3d at 314. The medical record does reveal that Plaintiff has undergone various conservative therapy methods, including: physical therapy, participation in a pain clinic, epidural steroid injections, a TENS unit, work hardening programs, and a home exercise program. (See e.g., R. at 111-61, 181-97, 208, 254-55, 260, 266-79.) Most of these measures proved to be ineffective in relieving Plaintiff's pain. (See R. at 181, 188, 208, 254-55.) However, the ALJ failed to address any of this evidence. Therefore, the Court cannot determine whether the ALJ considered this evidence in forming his credibility determination.

The Court, however, does not agree that the ALJ disregarded Plaintiff's MRI results – objective documentation of a condition likely to cause Plaintiff pain. As previously discussed, the ALJ's decision does demonstrate that he considered Plaintiff's MRI results.

Lastly, the Court agrees with Plaintiff that the ALJ did not address Plaintiff's reports of functional limitations regarding sitting, standing, or walking for prolonged periods as a result of pain. Plaintiff consistently and repeatedly complained to treating sources that his pain was exacerbated by sitting for prolonged periods of time. (R. at 158, 210, 256). The medical record also includes Plaintiff's reports of inability to stand/walk for extended periods of time. (R. at 158.) One of the factors to be considered by the ALJ in his credibility determination is Plaintiff's reports of functional limitations and restrictions. *Knight*, 55 F.3d at 314.

The Court finds that the ALJ's decision needs further discussion as to the ALJ's reasons for discounting objective evidence in the record that supports Plaintiff's complaints of pain, the side effects of his medication, and the inconsistencies regarding Plaintiff's daily activities and complaints of pain.

Plaintiff also argues that the factors the ALJ did rely on in his credibility determination can not properly be considered in isolation and need to be considered in light of all the

relevant evidence. (Pl. Mem. at 14.) The ALJ relied on the
October 2002 VA exam results that show normal findings,
Plaintiff's inconsistent use of prescribed medication, and
Plaintiff's daily activities, including looking for work. (R. at
14.) But the ALJ does not provide any discussion, even at a
minimal level, of evidence in the record showing that Plaintiff's
treating physicians diagnosed and treated Plaintiff for pain in
his lower back.

In January 2001, Plaintiff saw Dr. Shah, complaining of a
dull, nagging pain that got worse on prolonged standing and
ambulation. (R. at 175.) Dr. Shah diagnosed Plaintiff with a
lumbosacral strain, a right-sided hernia, and a herniated disc on
the lumbo-sacral spine area, and he prescribed Naprosyn and
Robaxin. (Id.) In July 2001, Dr. Rutkowski observed pain in
Plaintiff's lower back and buttocks and limited lumbar flexion.
(R. at 200-01). Dr. Rutkowski diagnosed Plaintiff with
degenerative disc disease. (Id.) The Court is unable to tell
whether the ALJ examined the full range of the medical evidence
and investigated medical findings that support Plaintiff's
complaints of pain.

The Court also agrees that the ALJ failed to address
Plaintiff's side effects of medication, as instructed by the
Regulations. See 20 C.F.R. §404.1529(c)(3). Medical evidence in
the record did indicate that Plaintiff experienced side effects

of drowsiness and grogginess after taking prescribed medication.
(R. at 210, 236, 274, 277, 278, 282.)

The Court acknowledges that an ALJ may rely on
inconsistencies between a claimant's daily activities and his
subjective complaints of pain. *Zurawski, 245 F.3d at 887.* But,
further articulation is required regarding the inconsistencies
between Plaintiff's complaints of pain and Plaintiff's daily
activities. Here, the ALJ makes a general statement that
Plaintiff's daily activities, which include looking for work, are
inconsistent with disability, but the ALJ does not explain the
nature of those inconsistencies. *Compare Zurawski*, 245 F.3d at
887 (finding that the ALJ's listing of Plaintiff's daily
activities was not sufficient to discount Plaintiff's
credibility, without explaining the inconsistencies, noting that
minimal daily activities do not necessarily establish that a
person is capable of engaging in substantial gainful activity).
Upon remand, the ALJ should list Plaintiff's daily activities
that undermine Plaintiff's complaints of pain and explain how
those activities are inconsistent with Plaintiff's claims.

The Commissioner argues that the ALJ had "ample reason" to
find that Plaintiff's complaints of disabling pain and
medication-induced drowsiness were not fully credible. (*See* Def.
Mem. at 8-10.) But the Commissioner includes reasons that were

not supplied by the ALJ.[4] (*See* Def. Mem. at 8-10; *compare* R. at 13-14). As previously discussed, the Court confines its analysis to the reasons provided by the ALJ in his decision. *Steele*, 290 F.3d at 941.

The Court lacks a sufficient basis upon which to uphold the ALJ's credibility determination. While it is the ALJ's role to determine whether or not to credit Plaintiff's subjective complaints of pain and functional limitations, the ALJ has to show that he considered more than the evidence that supports his conclusion. On remand, the ALJ must reevaluate Plaintiff's complaints of pain, with due regard for the factors raised by Plaintiff and evidence from the record that supports Plaintiff's claims. The ALJ also must provide further elaboration regarding the purported inconsistencies between Plaintiff's daily activities and his complaints of pain in order to allow meaningful review.

## IV. Light Work Determination

Finally, Plaintiff argues that the ALJ erred in concluding that Plaintiff was capable of light work. (Pl. Mem. at 14.) Plaintiff argues that, based on his own testimony, and the

---

[4] For example, the Commissioner points to Dr. Rutkowski's [sic] (Dr. Morales – consulting physician) comments that Plaintiff's MRI results were "very mild and cannot explain the great degree of pain that he is complaining of" as evidence that Plaintiff's complaints were not fully credible. And, the Commissioner points to Plaintiff's receipt of unemployment compensation as evidence that Plaintiff considered himself able to work.

limitations observed by the functional capacity evaluation personnel, he does not have the functional capabilities to do light work.[5] (Pl. Memo at 14-5.) Plaintiff points to the ALJ's reliance on the opinions of the SSA physicians in reaching his RFC finding and argues that, while the opinions of non-examining medical sources are to be considered, their opinions have limited value, especially when considering matters that can not be quantified by objective testing. (Id.) He further argues that the opinions of the SSA physicians are not supported by the record as a whole, and not based on all of the treatment evidence. (Id.)

A treating physician's opinion is entitled to controlling weight if it is well supported by medical evidence and not inconsistent with other substantial evidence in the record. Clifford, 227 F.3d at 870. An ALJ can deny controlling weight to a physician's opinion if it has internal inconsistencies. Id. However, a claimant is "not entitled to disability benefits simply because a physician finds that the claimant is 'disabled'

---

[5] Light work requires the ability to lift no more than 20 pounds at one time and the ability to lift up to 10 pounds frequently. 20 C.F.R. §§404.1567(b), 416.967(b). In addition, a full range of light work requires standing or walking, off and on, for a total of six hours out of an eight-hour workday. SSR 83-10. Claimant should have the ability to walk or stand for "extended periods." Allen v. Sullivan, 977 F.2d 385, 390 (7th Cir., 1992). Occasional stooping/bending is also required as well. SSR 83-14. When sitting is required, light work "involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §404.1567(b).

or 'unable to work.'" *Id.* Such determinations are reserved for the Commissioner and are not given any special significance. *See* 20 C.F.R. § 404.1527(e).

The Seventh Circuit has held that the reports of a treating physician should be favored over a consultant who merely reviews the file and does not examine the claimant, unless the treating physician is not credible. *Whitney*, 695 F.2d at 789. But the Seventh Circuit has recognized that a consulting physician's assessment may constitute substantial evidence as long as the consulting physician "adds new information or perspectives" and is not "just contradicting reports about the underlying facts or offering unfounded speculation." *Garrison v. Heckler*, 765 F.2d 710, 713 (7th Cir. 1985).

In cases where medical evaluations are primarily based on objective evidence, the ALJ does not have to give preference to treating physicians over non-examining physicians. *See Id.* at 714. But, when the "ability to observe the claimant over an extended period is essential to an accurate understanding," there is a preference for the views of the treating physicians over non-examining physicians. *Id.* at 715.

Here, the SSA physicians did not examine Plaintiff to render their report, but relied on medical evidence in the record. (*See* R. at 28-9, 30, 34, 37, 40.) However, their opinions have significant value, even when compared to the opinions of the

treating physicians in this case. The SSA physicians "add new information," as none of the treating physicians, with the exception of Dr. Shah, made any statements regarding Plaintiff's exertional limitations.[6] (*Compare* R. at 163, 167, 169-71, 176 with R. at 200-01, 209-41, 245-301.)

Plaintiff argues that, because this is a chronic pain case, a longitudinal view of Plaintiff and his functional capabilities is important, implying that the treating physicians' opinions should take preference over the non-examining physicians' opinions. (*See* Pl. Reply at 9, n. 3) In addition, there is question as to whether the SSA physicians actually reviewed the Functional Capacity Evaluation Report in their assessment. But the Commissioner argues that the opinions of the SSA physicians were supported by quantifiable objective testing – the functional capacity evaluation (FCE) report. (Def. Mem. at 14.)

Regardless, the ALJ did not solely rely on the opinion of the SSA physicians, but also relied on the evidence from the FCE report as substantial evidence for his decision.[7] (R. at 14.)

---

[6] Dr. Shah completed six work status reports from January 2001 to March 2001. In his first two reports, he concluded that Plaintiff was unable to work. In his third and fourth reports, Dr. Shah determined that Plaintiff was capable of light work with restrictions of no pushing/pulling or heavy lifting and minimum sitting, standing/walking, and stooping/bending. Dr. Shah indicates in his last two reports that Plaintiff is unable to work until completing a work hardening program.

[7] The FCE was conducted in September 2001, before the RFC assessment in October 2001. (R. at 203, 227.) But, Plaintiff points out that the RFC assessment form indicates that there were

Plaintiff argues, however, that the results from the FCE report actually support Plaintiff's argument that he can not meet the requirements of light work.[8]  (See Pl. Mem. at 15.)  But, the Court is not convinced by this argument.  The FCE personnel noted that the Plaintiff is currently functioning at a light-medium work level, as defined by the U.S. Department of Labor.  (R. at 203.)  The ALJ also classifies jobs as sedentary, light, medium, heavy, and very heavy, as defined by the Dictionary of Occupational Titles, published by the Department of Labor.  See 20 C.F.R. §404.1567.  Thus, the Court agrees with the Commissioner that, although the findings of the SSA physicians and the FCE report do not match verbatim, the FCE personnel were aware of the requirements of light work, as understood by the

---

no "treating or examining source statement(s) regarding the claimant's physical capacities in file."  (Pl. Reply at 9.)  However, SSA physicians include a notation in the RFC form that suggests that the FCE report was considered by the SSA physicians. ("[Plaintiff] has demonstrated the ability to perform work between the light and medium ranges.") (R. at 227.)

[8] Plaintiff notes that the SSA physicians concluded that Plaintiff could stand for six hours out of an eight-hour workday with normal work breaks, but the FCE report indicates that Plaintiff had decreased tolerance for sustained standing. (Pl. Reply at 10.)  Next, Plaintiff points out that the SSA physicians recommended that Plaintiff not engage in more than occasional stooping, but the FCE report indicates that the positions of stooping and twisting should be decreased or eliminated.  (Id.) Lastly, Plaintiff notes that the SSA physicians considered Plaintiff capable of lengthy walking required for light work, but the FCE report indicates that Plaintiff had a moderately decreased tolerance for walking.  (Id.)

SSA, when they opined that Plaintiff was capable of performing at the light-medium work level.

Although the Court agrees with the Commissioner that the opinions of the SSA physicians do not have limited value in this case, the Court directs that the ALJ further articulate his reasoning behind the RFC finding, explaining the preference he gave to non-examining physicians over treating physicians in this case. It is the ALJ's role to decide the weight given to different physicians' opinions in a disability case. *See* Stephens, 766 F.2d at 289. The ALJ must articulate his discussion in such a way as to enable the Court to trace the path of his reasoning. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

## Conclusion

For the reasons set forth above, the Court finds that the ALJ's written decision does not indicate that the ALJ conducted a complete review of the evidence and that substantial evidence supports the ALJ's decision. The ALJ's decision primarily falls short because of his failure to address relevant competing evidence from treating sources. The failure to address this evidence, consequently, may impact the ALJ's determinations regarding Plaintiff's ability to do his past work, ability to do light work, and Plaintiff's credibility. Further, the Court can not evaluate whether the ALJ properly rejected the evidence in

favor of other reports, or that he even examined the evidence, unless the ALJ explains his reasoning for rejecting this evidence.

The Court recognizes that it is possible that the ALJ will reach the same conclusion on remand, after discussion of the relevant evidence. But, case law requires that the ALJ give credence to relevant evidence that counters the ALJ's position and articulate, however minimally, the reasons for rejecting such evidence. *Stephens*, 766 F.2d at 288. The purpose of these rules is to ensure that the ALJ has, in fact, considered all of the relevant evidence and made the required determinations so as to facilitate meaningful appellate review. *Orlando*, 776 F.2d at 213.

Accordingly, the Court must grant Mr. Hastings' motion for summary judgment, and deny the Commissioner's motion for summary judgment. The case is remanded to the Commissioner for further proceedings not inconsistent with this Opinion and Order.

DATED: September 16, 2005          E N T E R E D:

Arlander Keys
United States Magistrate Judge

48